## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **JOEL COFIELD**,<br>                              Plaintiff,<br><br>                    v.<br><br>**LORI CHAVEZ-DEREMER**, in her official<br>capacity as Secretary of Labor,<br>                              Defendant. | Case No. 21-cv-1755 (CRC) |

## <u>MEMORANDUM OPINION</u>

Veteran Department of Labor ("DOL") employee Joel Cofield has been repeatedly passed over for promotions over his two-decade tenure at the agency, much to his appreciable chagrin.  After exhausting the administrative process, Cofield sued DOL[1] under Title VII, alleging three instances of disparate treatment since 2016 on the basis of race, color, and sex. DOL has moved for summary judgment on Cofield's non-selection claims, contending that it had a legitimate, non-discriminatory reason for denying him each job opportunity and that the agency's reason was not pretext for invidious discrimination.

The Court gets Cofield's frustration over his stalled career progression.  But he has not furnished sufficient evidence for a reasonable jury to conclude that DOL's proffered reason for each of the three non-selections was pretext for race-, color-, or sex-based discrimination.  The Court must therefore grant DOL's motion for summary judgment.

---

[1]  The Court has substituted Secretary Chavez-Deremer in as Defendant per Fed. R. Civ. P. 25(d).

## I.    Background[2]

Plaintiff Joel Cofield, who is African-American, has served as a claims examiner in the Department of Labor's Office of Workers' Compensation Program ("OWCP") for roughly twenty years.  Def.'s Stmt. of Undisputed Material Facts ("DSUMF") ¶¶ 1–2, 7.  During his time at OWCP, Mr. Cofield has worked in the Policy Branch of what used to be known as the Longshore and Harbor Workers' Compensation Division and is now the Division of Federal Employees' and Longshore and Harbor Workers' Compensation Division; for ease, this Opinion refers to this component of OWCP as the "Longshore Division."  Id. ¶¶ 7–8.  As a claims examiner, Cofield has worked on a number of legal and policy issues related to federal workers' compensation law, served as a Freedom of Information Act ("FOIA") coordinator, and supported communications work for the Longshore Division.  Def.'s Ex. 1, Select Portions of 2017 Report of Investigation ("2017 ROI") at 266–67.

The Policy Branch of the Longshore Division is a small team, comprising a handful of claims examiners, one Assistant Policy Branch Chief (a GS-14 position), and one Policy Branch Chief (a GS-15 position).  DSUMF ¶¶ 21–22.  When Cofield first joined the Policy Branch in 2006, he was a GS-13, Step 1 on the federal pay scale.  Id. ¶ 10.  He is now a GS-13, Step 10, which is the maximum grade and step that he is eligible for as a claims examiner.  Id. ¶ 11.  Although Cofield has never been permanently promoted, he has twice briefly assumed the

_____

[2] Under Local Rule 7(h), when "facts identified by the moving party in its statement of material facts" are not "controverted in the statement of genuine issues filed in opposition," the Court "may assume that [those facts] are admitted."  In reciting the facts of this case, the Court largely draws from the Defendant's statement of undisputed facts, except where contested in the Plaintiff's counter-statement, or where a factual dispute is evident from the record and the Court excuses the Plaintiff's failure to identify such a dispute, as is within its discretion.  Cf. Burke v. Gould, 286 F.3d 513, 518 (D.C. Cir. 2006).  Where there is a tension or dispute of fact, the Court so notes.

Assistant Policy Branch Chief position on a temporary basis, first between August 2013 and January 2014 and then again between September and December 2021.  Id. ¶¶ 12–17.

Cofield's claims in this case stem from his non-selection for three positions.  The Court provides a general overview of the non-selections here, leaving a more detailed recitation of the facts for the Analysis section of this Opinion.

A.  The Lead Communications and Information Management Analyst Position

In July 2016, Cofield applied to serve as Lead Communications and Information Management Analyst ("Lead Analyst") in the OWCP Division of Administration and Operations.  DSUMF ¶ 25.  Division head Lynda Kramer was responsible for hiring; along with Lead Analyst Michelle Wood, Kramer interviewed fourteen people for the position, including Cofield, and had each candidate complete two written tasks.  Id. at ¶¶ 27, 32–33, 36–38, 45.

Kramer and Wood selected two candidates to move forward: Mia Day, an African-American female, and another candidate, a white female.  Id. ¶¶ 41–43, 52.  Both performed especially well in the interview and on the writing assignments.  Ms. Day was ultimately selected for the position based on her strong performance in the first round of interviews and her years of specialized experience in FOIA and Privacy Act work.  Id. ¶¶ 28, 41, 49–50; Def.'s Ex. 7, Lynda Kramer Deposition ("Kramer Dep.") at 34:15–36:17.  Cofield's writing assignments were not as strong, and he was ranked in the lower half of candidates after the first round of interviews. DSUMF ¶ 48; see also Motion for Summary Judgment ("MSJ") at 25–26.

B.  The Acting Assistant Policy Branch Chief Position

Cofield's next grievance stems from a shuffling of Longshore Division leadership, which created a temporary vacancy in the Assistant Policy Branch Chief position.  The Longshore Division has two branches: the Policy Branch, where Cofield works, and the Fiscal Branch.  See

Def.'s Ex. 27, Longshore Division Organizational Chart as of Aug. 13, 2019.  In 2018,
Longshore Division Director Douglas Fitzgerald was informed that he needed to detail the Fiscal
Branch Chief to the OWCP Director for a special project.  Def.'s Ex. 10, Douglas Fitzgerald
Deposition ("Fitzgerald Dep.") at 19:17–22.  The only person who could fill the Fiscal Branch
Chief role was Linda Almaguer, who was then serving as Assistant Policy Branch Chief.  Id. at
20:2–7.  Moving Ms. Almaguer to the Fiscal Branch for a short-term stint left the Assistant
Policy Branch Chief position temporarily open.  Id. at 20:12–15.  It was not initially known how
long Almaguer would be gone.  DSUMF ¶ 74.

Kristina Hall, then serving as Policy Branch Chief, was tasked with filling the opening,
and she had two options: Cofield or Maria Mayrand (a white female), who were the only claims
examiners in the Policy Branch at the time.  DSUMF ¶ 62.  The record suggests that Hall
distributed some assistant chief responsibilities to both individuals, but Mayrand appears to have
received most of them, and Cofield maintains that he had already been carrying out the
additional duties he was assigned.  See, e.g., Def.'s Ex. 3, Joel Cofield Deposition ("Cofield
Dep.") at 24–31; Def.'s Ex. 11, First Affidavit of Kristina Hall ("1st Hall Aff.") at 5, 7; Def.'s
Ex. 12, Second Affidavit of Kristina Hall ("2d Hall Aff.") at 2; Def.'s Ex. 15, Kristina Hall
Deposition ("Hall Dep.") at 27:8–12; see also Opposition to Motion for Summary Judgment
("Opp. to MSJ") at 13 ("It is clear Cofield was given additional duties and responsibilities while
Almaguer was on detail . . .").

In September 2018, Hall announced that Mayrand would "informally" serve as Acting
Assistant Policy Branch Chief.  Def.'s Ex. 15, Hall Dep. at 38:10–11; see also DSUMF ¶ 71.  In
November, Mayrand was formally promoted to the acting position and compensated at the

corresponding GS-14 level until February 2019, when Almaguer returned.  DSUMF ¶¶ 75–77.

Cofield never got the chance to rotate into the position during Almaguer's absence.

    C.  <u>The Deputy Fiscal Branch Chief Position</u>

    In December 2021, Cofield applied for a GS-14 position in the Longshore Division, this

time as a Lead Workers' Compensation Claims Examiner/Deputy Fiscal Branch Chief ("Deputy

Fiscal Branch Chief").  DSUMF ¶ 84.  Longshore Division Deputy Director Stephanie Brown

was responsible for hiring, with input from Joel Romero, who had just joined the agency as

Fiscal Branch Chief.  <u>Id.</u> ¶¶ 89–92.

    Brown and Romero interviewed three candidates for the position, all GS-13 claims

examiners: Cofield, an unnamed African-American female, and Steven Aronson, a white male.

<u>Id.</u> ¶¶ 87, 94; Pl.'s Stmt. of Disputed Material Facts ("PSDMF") ¶ 16; Def.'s Resp. to PSDMF ¶

16.  The candidates were asked the same questions during their interviews and then completed a

timed writing assignment that required them to calculate an overpayment on a workers'

compensation claim.  DSUMF ¶¶ 95, 105–06.  Brown ultimately selected Aronson for the

position based on his "excellent" interview and correct overpayment calculation.  <u>Id.</u> ¶¶ 102–04,

107.  Cofield's interview performance was deemed good, but markedly less strong, and he did

not correctly complete the written assignment.  <u>Id.</u> ¶¶ 96–100, 101, 108.

    D.  <u>Procedural History</u>

    Cofield filed Equal Employment Opportunity ("EEO") complaints after he was passed

over for the Lead Analyst and Acting Assistant Policy Branch positions.  <u>Id.</u> ¶¶ 120, 127.  After

losing these administrative battles, <u>see id.</u> ¶¶ 121–25, 128, he filed suit in this court in June 2021.

Cofield initially brought a bevy of discrimination claims, which have been refined over time and

across multiple complaints.  The operative complaint raises three claims stemming from the non-

5

selections described above, the third of which was added after Cofield was denied the Deputy Fiscal Branch Chief job and exhausted that EEO administrative process.  Id. ¶¶ 129–130. Following about a year of discovery, the Department filed its motion for summary judgment, which is now ripe for the Court's review.

## II.    Legal Standard

### A.    Summary Judgment Standard

Summary judgment shall be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party moving for summary judgment bears the burden of demonstrating the "absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Fed. R. Civ. P. 56(c)(1).  A fact is material if it "might affect the outcome of the suit under governing law," and a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," meaning that more than a mere "scintilla of evidence [supports its] position." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 252 (1986).

In deciding a motion for summary judgment, courts "view the facts and draw reasonable inferences 'in the light most favorable to the [non-moving] party.'"  Scott v. Harris, 550 U.S. 372, 378 (2007) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam)). At this stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Anderson, 477 U.S. at 249.  "Although, as a rule, statements made by the party opposing a motion for summary judgment must be accepted as true for the purpose of ruling on that motion, some statements are so conclusory as to come within an exception to that rule."  Greene v. Dalton, 164 F.3d 671, 675 (D.C. Cir. 1999).  In other words, the non-movant may not rely on "mere allegations" or

conclusory statements to defeat a motion for summary judgment.  FDIC v. Bank of America, N.A., 783 F. Supp. 3d 1, 15 (D.D.C. 2025) (quoting Equal Rts. Ctr. v. Post Props., Inc., 633 F.3d 1136, 1141 n.3 (D.C. Cir. 2011)).

     B.  Evaluating Title VII Non-Selection Claims at Summary Judgment

Title VII of the Civil Rights Act of 1964 "reflects the American promise of equal opportunity in the workforce and shields employees from certain pernicious forms of discrimination."  Figueroa v. Pompeo, 923 F.3d 1078, 1082–83 (D.C. Cir. 2019).  In addition to protecting private-sector employees, the statute provides relief to federal employees or applicants for federal employment who are subjected to "discrimination based on race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-16(a).  Under a disparate treatment theory of Title VII liability, which Cofield invokes here, "a worker seeks to prove that an employer intentionally treats some people less favorably than others because of" a protected characteristic.  Figueroa, 923 F.3d at 1086 (quoting Segar v. Smith, 738 F.2d 1249, 1265 (D.C. Cir. 1984)) (cleaned up).  "Proof of illicit motive is essential, and the employee at all times has the burden of proving that the defendant intentionally discriminated against [him]."  Id. (quoting Segar, 738 F.2d at 1265, 1267) (cleaned up).

Notwithstanding that a Title VII plaintiff bears the ultimate burden of proving intentional discrimination, plaintiffs may draw on the "three-step McDonnell Douglas method of proof when they have only circumstantial evidence of improper intent."  Id.; see also Ames v. Ohio Dep't of Youth Serv., 605 U.S. 303, 308 n.2 (2025) (explaining that although the McDonnell Douglas inquiry is often characterized as a "burden-shifting" framework, it "merely aims to provide a sensible, orderly way to evaluate the evidence that bears on the critical question of discrimination" (cleaned up)).  The first step of the McDonnell Douglas inquiry requires the

employee to establish a prima facie case of discrimination. If he does, the "burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its action." Figueroa, 923 F.3d at 1086 (quoting Wheeler v. Georgetown Univ. Hosp., 812 F.3d 1109, 1114 (D.C. Cir. 2016)). If the employer does so, the burden shifts back, and the employee "must prove that, despite the proffered reason, [he] has been the victim of intentional discrimination." Id.

DOL does not contest whether Cofield has established a prima facie case and instead jumps right to explaining his non-selection for the three positions at issue. MSJ at 15. The Court accordingly focuses its attention on the second and third prongs of the McDonnell Douglas inquiry. Cf. Brady v. Off. of Serg. at Arms, 520 F.3d 490, 494 (D.C. Cir. 2008) ("In a Title VII disparate-treatment suit where an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case under McDonnell Douglas." (emphasis in original)).

Although there are "[n]umerous factors [that] may come into play at the second prong" of the burden-shifting inquiry, four are "paramount" in determining whether the employer has proffered a satisfactory explanation for its adverse employment decision: (1) "the employer must produce evidence that a factfinder may consider at trial (or a summary judgment proceeding)"; (2) "the factfinder, if it 'believed' the evidence, must reasonably be able to find that 'the employer's action was motivated by' a nondiscriminatory reason"; (3) "the nondiscriminatory explanation must be legitimate" or "facially 'credible' in light of the proffered evidence"; and (4) "the evidence must present a 'clear and reasonably specific explanation.'" Figueroa, 923 F.3d at 1087–88 (citations omitted).

The third prong of the McDonnell Douglas analysis boils down to "one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on [a prohibited] basis?" Johnson v. Perez, 823 F.3d 701, 706 (D.C. Cir. 2016) (quoting Brady, 520 F.3d at 494).

The D.C. Circuit has laid out a specific "framework" for answering this question where a plaintiff challenges his non-selection for a particular employment opportunity. Stoe v. Barr, 960 F.3d 627, 642 (D.C. Cir. 2020). In some circumstances, "qualifications evidence may suffice" to show that "an employer's proffered explanation is pretext for discrimination," thereby resolving the third-prong inquiry. Id. at 641–42 (quoting Ash v. Tyson Foods, Inc., 546 U.S. 454, 457 (2006)). But "a disparity in qualifications, *standing alone*, can support an inference of discrimination only when the qualifications gap is great enough to be *inherently indicative* of discrimination—that is, when the plaintiff is markedly more qualified, substantially more qualified, or significantly better qualified than the successful candidate." Id. at 643 (cleaned up) (emphasis added) (quoting Hamilton v. Geithner, 666 F.3d 1344, 1352 (D.C. Cir. 2012)). The qualifications gap must be significant because, where comparative qualifications are close, "a reasonable jury would not usually find discrimination," as "the jury would 'assume that the employer is more capable of assessing the significance of small differences in the qualifications of the candidates, or that the employer simply made a judgment call.'" Adeyemi v. District of Columbia, 525 F.3d 1222, 1227 (D.C. Cir. 2008) (quoting Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1294 (D.C. Cir. 1998) (en banc)).

At the same time, plaintiffs are "expressly *not* limited to comparing their qualifications against those of the successful applicant," and may instead "seek to expose other flaws in the

employer's explanation." <u>Stoe</u>, 960 F.3d at 642 (cleaned up) (emphasis in original) (quoting <u>Hamilton</u>, 666 F.3d at 1352). "[S]uperior qualifications taken together with other flaws in the employer's explanation"—for instance, "procedural irregularities in the selection process, false testimony, and accumulated evidence of . . . bias" against the employee—may "create[] a genuine issue of material fact that only a jury can resolve." <u>Id.</u> at 642–43 (cleaned up) (quoting <u>Hamilton</u>, 666 F.3d at 1352). A plaintiff may also poke holes in the employer's rationale by citing "the employer's pattern of poor treatment of other employees in the same protected group as the plaintiff, or other relevant evidence that a jury could reasonably conclude evinces an illicit motive." <u>Walker v. Johnson</u>, 798 F.3d 1085, 1092 (D.C. Cir. 2015).

The D.C. Circuit's approach to the third prong of the <u>McDonnell Douglas</u> inquiry in non-selection cases comports with a more general set of Title VII principles. On one hand, "a plaintiff is not 'presumptively required to submit evidence over and above [evidence of pretext] in order to avoid summary judgment.'" <u>Walker</u>, 798 F.3d at 1093 (quoting <u>Aka</u>, 156 F.3d at 1292). On the other, "[w]hether evidence offered to show that an employer's explanation is false itself suffices to raise an inference of unlawful discrimination . . . is a fact-sensitive inquiry." <u>Id.</u> at 1092. "Because such judgments are contextual, 'the plaintiff cannot always avoid summary judgment by showing the employer's explanation to be false,'" <u>id.</u> at 1093 (quoting <u>Aka</u>, 156 F.3d at 1292), and the "evidence of record must be such that a reasonable jury could not only disbelieve the employer's reasons, but conclude that the real reason the employer took a challenged action was a prohibited one," <u>id.</u>[3] So, for instance, the D.C. Circuit has "held that an

_____

[3] <u>See also</u> <u>Hairston v. Vance-Cooks</u>, 773 F.3d 266, 272 (D.C. Cir. 2014) ("Ordinarily, if a plaintiff identifies evidence from which a jury could find that the employer's stated reasons were pretextual, that will be enough to get his claim to a jury. Showing pretext, however, requires more than simply criticizing the employer's decisionmaking process. Even if a plaintiff was victimized by poor selection procedures, we may not second-guess an employer's personnel

employer's 'admi[ssion] to having lied' about why it failed to hire a black applicant, *together* with evidence that the employer lacked knowledge about the applicant's experience and that its hiring practices 'were generally inhospitable to minorities,' could support an inference that the employer was hiding a true, discriminatory motive."  Id. (emphasis added) (quoting Colbert v. Tapella, 649 F.3d 756, 760 (D.C. Cir. 2011)).  Similarly, the court has held that the denial of summary judgment is warranted where an employer offers seemingly insincere reasons for refusing to promote an employee, and there is additional evidence that decision-makers in the hiring process engaged in discriminatory name-calling and mocked the employee's accent. Mayorga v. Merdon, 928 F.3d 84, 93–95 (D.C. Cir. 2019).

One final note about pretext and plaintiff testimony:  "[T]here is no rule of law that the testimony of a discrimination plaintiff, standing alone, can never make out a case of discrimination that could withstand a summary judgment motion."  Johnson, 823 F.3d at 710 (quoting Desmond v. Mukasey, 530 F.3d 944, 964 (D.C. Cir. 2008)).  Thus, it is possible for a plaintiff's "specific and relevant" testimony to create a genuine issue of material fact regarding pretext, even if his testimony is "self-serving" or "uncorroborated," because "it is ordinarily the role of the jury—not the court on summary judgment—to discount" testimony that "may be impaired by party self-interest."  Id. at 710–11.  By contrast, "[c]ourts may grant summary judgment to a defendant where a plaintiff's evidence," including his own testimony, "is vague and conclusory."  Id. at 710.  And of course, where one party's story is "blatantly contradicted by

---

decision absent demonstrably discriminatory motive." (cleaned up)); Montgomery v. Chao, 546 F.3d 703, 707 (D.C. Cir. 2008) ("It is true that a plaintiff can attempt to show that the employer's explanation misstates the candidates' qualifications, and that adequate evidence of this type may suffice to permit a jury to infer that the employer's explanation is incorrect or fabricated, and thus to infer discrimination . . . [But under specific] circumstances, an inference of discriminatory animus [may] not [be] reasonable." (cleaned up)).

the record, so that no reasonable jury could believe it," summary judgment is also appropriate.

Lash v. Lemke, 786 F.3d 1, 6 (D.C. Cir. 2015) (quoting Scott, 550 U.S. at 380).

### III.    Analysis

With this doctrinal roadmap before it, the Court turns to Cofield's non-selection claims.

As a preliminary matter, applying the four Figueroa factors, the Court is persuaded that DOL has proffered a legitimate, non-discriminatory reason for not selecting Cofield as Lead Analyst, Acting Assistant Policy Branch Chief, or Deputy Fiscal Branch Chief.  *First*, DOL has "produce[d] evidence that a factfinder may consider at trial."  Figueroa, 923 F.3d at 1087. Current and former DOL staff, including Lynda Kramer, Michelle Wood, Kristina Hall, Douglas Fitzgerald, Stephanie Brown, and Joel Romero, would be able to testify at trial as to their decision-making rationales, and contemporaneous documents, including resumes and the candidates' written assignments, would be available for the factfinder's review.  *Second*, if the factfinder believed the government's evidence, it could reasonably find that the government's actions were motivated by a common nondiscriminatory reason—namely, that a candidate other than Cofield was better qualified for the specific job in question.  Id.  *Third*, the government's explanation is "legitimate" or "facially credible" based on the "proffered evidence."  Id. at 1088 (citation omitted).  Indeed, there is substantial evidence to support that Mia Day, Maria Mayrand, and Steven Aronson were more qualified than Cofield for each of the positions for which they were selected.  And *fourth*, "the evidence . . . present[s] a clear and reasonably specific explanation."  Id. (citation omitted).  The government has identified particular pieces of evidence—including performance on written tests and in interviews—that elucidate why Day, Mayrand, and Aronson edged Cofield out for the positions in question.

The remaining inquiry is thus whether Cofield has "produced sufficient evidence for a reasonable jury to find that" DOL's "asserted non-discriminatory reason[s]" for denying him the three positions were merely pretextual, and that DOL "intentionally discriminated against the employee on [a prohibited] basis." Johnson, 823 F.3d at 706 (quoting Brady, 520 F.3d at 494). The Court reviews the granular facts of each non-selection and tackles the third-prong McDonnell Douglas inquiry as to each claim in turn.

### A. Cofield's Non-Selection as Lead Analyst

#### 1. Relevant Facts

In 2016, Cofield applied to be a Lead Analyst in OWCP's Division of Administration and Operations. The advertisement for the Lead Analyst position listed several potential duties, including providing support for the agency's communication and outreach initiatives; serving as the information clearance officer for the OWCP; coordinating OWCP's FOIA and Privacy Act activities; serving as a team leader; and assisting the Division's Director with speeches, briefings, and presentations. DSUMF ¶ 26; Def.'s Ex. 1, 2017 ROI at 146–47.

The agency's human resources team identified Cofield as one of eighteen people qualified for the Lead Analyst position and referred those names to Lynda Kramer, then-head of the Division. DSUMF ¶¶ 27, 32–33. Ms. Kramer offered interviews to all eighteen candidates, four of whom declined the offer. Id. ¶ 36. Kramer, along with staff member Michelle Wood, then interviewed the fourteen remaining individuals, "ask[ing] each interviewee a structured series of identical questions" and then "administering two timed writing assignments to each person." Id. ¶ 38. The first writing assignment required candidates to edit a memo that had several errors, and the second called on candidates to draft a response to an inquiry from a party outside the agency. Id. ¶ 45. Kramer and Wood also assessed each candidate's qualifications

based on a review of their resume and application, with a focus on their experience with FOIA and team leadership.  Id. ¶¶ 39, 47.

Kramer and Wood chose two candidates, Mia Day and another unnamed candidate, to move forward in the interview process.  Id. ¶¶ 41–43.  Ms. Day had worked as FOIA Program Specialist/Government Information Specialist at the Department of Homeland Security ("DHS") for five years when she applied for the Lead Analyst job; prior to that, she had worked for roughly four years as a Staff Assistant/FOIA officer for the DHS Office of General Counsel and a FOIA Staff Assistant at the Administration for Children and Families.  See Def.'s Ex. 1, 2017 ROI at 288–93.

Day and the other finalist advanced because they performed especially well in the first round of the hiring process.  Day made six errors on her first writing assignment, and her second was deemed "excellent"; the other finalist made four errors on her first assignment and also received an "excellent" on her second.  DSUMF ¶¶ 49–50.  Cofield, by contrast, made thirteen errors on his first assignment and received an "acceptable" on his second.  Id. ¶ 48.  As for other qualifications, Kramer and Wood described the finalists' communication, writing, FOIA, and Privacy Act skills as "strong" and "outstanding."  Id. ¶ 52.  According to Kramer, as compared with Cofield, Day had "more experience that was reflected in her resume" in performing FOIA and Privacy Act work.  Def.'s Ex. 7, Kramer Dep. at 34:15–36:17.  Although Day applied to the OWCP position from another government agency, experience working at OWCP and in workers' compensation was not required for the Lead Analyst position, nor does Cofield recall Kramer or Wood informing him that such experience was necessary.  DSUMF ¶ 56.

Day and the other finalist participated in second-round interviews with the Director and Deputy Director of the Longshore Division.  Id. ¶¶ 41–42.  After considering feedback from

these interviews, and reaching out to the finalists' references, Kramer selected Day for the Lead Analyst position.  Id. ¶¶ 28, 41.

In affidavits and depositions, Cofield identified a few inconsistencies or irregularities that he perceived during the hiring process.  First, he testified that Kramer misjudged his experience, as her interview notes suggest that Cofield had "2 to 3 years FOIA coordination," rather than the eight years he professed to have at the time of his interview.  PSDMF ¶ 2; Pl.'s Ex. A, Cofield Dep. at 59:14–17; Pl.'s Ex. E, 2017 ROI at 272.  (Wood's notes, meanwhile, reflect that Cofield had "2–8 yrs" of FOIA coordination experience.  Pl.'s Ex. E, 2017 ROI at 274.)  Second, though Kramer only referred two candidates for a second interview and made the final hiring decision, Cofield insists that she told him that she and Wood were the "initial interviewers" and would refer three candidates to the Director and Deputy Director, who would make the final decision.  PSDMF ¶ 3; Pl.'s Ex. F, EEO Investigative Affidavit of Complainant Joel Cofield ("Cofield EEO Aff.") at 116; Pl.'s Ex. A, Cofield Dep. at 264:18–20, 286:14–23.  And third, despite Kramer testifying that she met Cofield for the first time on the day of his interview, Def.'s Ex. 7, Kramer Dep. at 18:15–18, Cofield suggests that they must have met before because he had "attended several FOIA trainings given by Kramer."  PSDMF ¶ 1.

### 2. *Third-Prong* McDonnell Douglas *Analysis*

According to DOL, Cofield was not selected for the Lead Analyst position in 2016 because Day was the best candidate for the job.  Day had a "higher level of expertise" than Cofield with FOIA and the Privacy Act; she performed better than Cofield in her interview and on her written assessments; and Cofield's performance during the hiring process ranked him in the bottom half of the candidates interviewed for the position.  MSJ at 25–26.

The Court first considers whether Day and Cofield's comparative qualifications "suffice" to show that DOL's "proffered explanation is pretext for discrimination." Stoe, 960 F.3d at 642–43 (quoting Ash, 546 U.S. at 457). To make this showing, "the qualifications gap" between the plaintiff and the successful candidate "must be great enough to be inherently indicative of discrimination." Holcomb v. Powell, 433 F.3d 889, 897 (D.C. Cir. 2006). For instance, in Aka, the D.C. Circuit considered whether a plaintiff in an employment discrimination case was substantially better qualified than the successful contender for a pharmacy technician job at a hospital, which required "previous hospital experience in pharmacy services" and "knowledge of hospital terminology." 156 F.3d at 1295. The court concluded that a reasonable jury could find the plaintiff substantially better qualified for the position because he had significantly more years of experience (nineteen years versus two months), more advanced academic credentials (specialized master's degree versus no college degree), and far greater familiarity with the hospital. Id. at 1296–97.

Here, the record demonstrates that Cofield was *not* substantially more qualified than Day for the Lead Analyst position. Take, for instance, the candidates' relative experience in FOIA and the Privacy Act, an important qualification for the Lead Analyst position. DSUMF ¶ 25. At the time of the interview, Day had served for roughly five years as "[FOIA] Program Specialist/Government Information Specialist" at DHS, where she "process[ed] incoming FOIA and [Privacy Act] requests" and "assess[ed], review[ed], and analyz[ed] the requests and clearance of information in response to requests," among many other FOIA- and Privacy Act-related responsibilities. Def.'s Ex. 1, 2017 ROI at 288. Day had also previously served as a FOIA specialist for roughly four years, bringing her total FOIA experience in federal

government to at least nine years.  Id. at 289–90.  Cofield, by contrast, would have had, at best, roughly eight years of part-time FOIA experience.  Id. at 267–68; see also PSDMF ¶ 2.

Next, consider Day and Cofield's relative performances during the hiring process.  Day made six errors on her first writing assignment, compared to Cofield's thirteen, and Day received an "excellent" on her second writing assignment, while Cofield's was incomplete and otherwise only "acceptable."  DSUMF ¶¶ 48–50; Def.'s Ex. 1, 2017 ROI at 277.  Performance on the written assessments was important because the Lead Analyst would be expected to "coordinate all incoming and outgoing" communications with OWCP, see Def.'s Ex. 7, Kramer Dep. at 31:16–22, and Cofield's evaluation placed him in the bottom half of candidates for the position.  Cofield does not point to any concrete evidence to suggest that he performed markedly better than Day during the selection process.

All in all, "the record in this case" does not "surely support[] [Cofield's] claim that [he] was better qualified than [Day]," Stoe, 960 F.3d at 642, let alone so much more qualified as to render the hiring decision "inherently indicative of discrimination."[4]  Holcomb, 433 F.3d at 897.

Because the Court concludes that Cofield was not markedly better suited than Day for the Lead Analyst position, it next considers whether any other circumstances could allow a reasonable jury to infer that the DOL's explanation for selecting Day instead of Cofield was pretext for invidious discrimination.  To this end, Cofield identifies two potential concerns: Kramer's misstatement of Cofield's years of FOIA experience and her purported misrepresentation of the hiring process.[5]

---

[4] The Court also notes that the agency's relatively standardized assessments methods undercut Cofield's assertion that Kramer and Wood "used entirely subjective criteria to narrow down the field to two final candidates."  Opp. to MSJ at 9.

[5] As noted above, Cofield also disputes Kramer's deposition testimony that she "did not meet [Cofield] until the day of his interview," pointing out that he had "attended several FOIA

Cofield first points out that Kramer mis-recorded his number of years of FOIA experience in her interview notes:  She "wrote that Cofield had only 2-3 years of experience in FOIA," but he apparently "had 8 years of experience at the time of his interview in 2016." PSDMF ¶ 2.  It is true that a misstatement of a candidate's qualifications may betray pretext; as Aka put it, "if the employer says that it did not hire the plaintiff because he did not speak Portuguese, the plaintiff can show that he *did* speak Portuguese, and that the employer knew it." 156 F.3d at 1295 (emphasis in original).  Enough "evidence of this type may suffice to permit a jury to infer that the employer's explanation is incorrect or fabricated, and thus to infer discrimination."  Id.; see also Fischbach v. D.C. Dep't. of Corr., 86 F.3d 1180, 1183 (D.C. Cir. 1996) ("[I]f the employer made an error too obvious to be unintentional, perhaps it had an unlawful motive for doing so.").

Setting aside potential hearsay concerns and making every inference in Cofield's favor, Cofield's argument still falls short.  Kramer never said that Cofield was not hired because he only had "2-3 years" of FOIA experience; instead, she chose Day over Cofield because, among other successful qualities, Day had relatively more expertise with FOIA and the Privacy Act.  As stated above, even crediting Cofield with eight years of part-time FOIA work, the record reflects that Day had roughly nine years of FOIA and Privacy Act exposure, many of which were

---

trainings led by Kramer."  PSDMF ¶ 1.  The record does not reflect a genuine factual dispute on this point.  To begin, Cofield cites to his own deposition testimony to substantiate his attendance at FOIA trainings led by Kramer, id., but the cited testimony says nothing of the sort, see Pl.'s Ex. A, Cofield Dep. at 59:14–17.  Even if it did, Cofield's mere attendance at FOIA trainings does not establish that he and Kramer met personally, or that Kramer would remember seeing Cofield at those trainings.  Kramer does not deny that she "knew" of Cofield before the interview, Def.'s Ex. 7, Kramer Dep. at 18:19–19:4, 21:2–7, just that she had met him.  So absent non-conclusory evidence that Cofield and Kramer had met prior to the interview, the Court is not persuaded that a genuine dispute of fact exists (and is also skeptical that such a dispute, if genuine, would be material).

focused full-time on such duties.  Even if Kramer mis-recorded Cofield's years of FOIA experience during the interview itself, her misstatement fails to "show that [her ultimate] explanation" was incorrect or "fabricated after the fact."  Aka, 156 F.3d at 1295.

Cofield also contends that Kramer misrepresented the logistics of the hiring process during his interview, stating that three candidates (rather than two) would be selected for the next round of interviews and that the Longshore Division Director and Deputy Director (rather than Kramer herself) would make the final decision.  PSDMF ¶ 3; see also Pl.'s Ex. F, Cofield EEO Aff. at 116; Pl.'s Ex. A, Cofield Dep. at 264:18–20, 286:14–23.  Cofield suggests that these mischaracterizations "call into question her credibility and the veracity of her statements."  Opp. to MSJ at 10.

At this stage, it is not the Court's role to weigh Kramer's credibility.  But even assuming that the purported misstatements *do* cast doubt on her credibility, a reasonable jury could not conclude, on this record, that her misstatement was pretext for unlawful discrimination. Notwithstanding Cofield's own general attestation that there are few, if any, African-American men in the upper ranks of OWCP and the Longshore Division,[6] see, e.g., Def.'s Ex. 5, Cofield EEO Aff. at 10, he offers no evidence to support an inference that Kramer's decision was really motivated by discriminatory animus.  Compare this case to Stoe, where the plaintiff

_____

[6] The Court notes that some unrebutted evidence in the record undercuts Cofield's atmospheric observations about the makeup of the OWCP.  Contrary to Cofield's allegations in the operative complaint, see Third Amended Compl. ¶¶ 39, 44–45, an African-American male in the Policy Branch was promoted to a GS-13 level claims examiner position and then promoted again to a GS-14 level position in the OWCP's Administrative Division, DSUMF ¶ 23–24. What's more, Cofield does not contest DOL's observation that "at least thirteen other employees within [OWCP], five of whom are Caucasian females, [and four of whom are Caucasian males], have been hired at the GS-13 level and remained at that level for fifteen years or more."  MSJ at 30 (citing Def.'s Ex. 24, Def.'s Supp. Resp. to Pl.'s 2d Disc. Req. at 2).  Furthermore, while not dispositive, the fact that Day is also African-American somewhat undercuts Cofield's claim that he was discriminated against based on his race or color.

offered compelling evidence to prove that [her supervisor] had: (1) discriminated against Stoe on the basis of her gender in the past; (2) ruled Stoe out of consideration for the promotion even before she was interviewed; (3) designed the interview questions and process to mask Stoe's superior qualifications; (4) allowed gender bias to taint his scoring of the candidates in their interviews; (5) influenced the other panelists' scoring to the detriment of Stoe; (6) infected the selection process with his bias by sending out his votes to the panel in advance of their final deliberations; (7) in effect reported to his superior that [the successful candidate] had been selected before deliberating with other members of the panel; and (8) provided shifting and false rationales for his inconsistent actions.

960 F.3d at 643.

To be clear, a plaintiff opposing a summary judgment motion in a Title VII non-selection case need not have the same volume of bias evidence as the plaintiff in Stoe. For instance, in Hamilton, the D.C. Circuit reversed a grant of summary judgment in a non-selection case where the plaintiff had significantly superior qualifications to the chosen candidate; the government's proffered nondiscrimination explanation was "highly subjective"; and there was no "contemporaneous documentation supporting that explanation." 666 F.3d at 1355–57.

But here, the record supports that Day was the superior candidate, and even if the Court were to make every reasonable inference in Cofield's favor, the only semblance of a procedural irregularity is that Kramer failed to clearly communicate the details of the hiring process to Cofield. Standing alone, this failure would be an insufficient basis for a reasonable jury to decide that Cofield was the subject of unlawful discrimination. DOL is therefore entitled to summary judgment on Cofield's first non-selection claim.

B.  Cofield's Non-Selection as Acting Assistant Policy Branch Chief

1.  Relevant Facts

The Court next turns to Cofield's non-selection as Acting Assistant Policy Branch Chief in fall of 2018.

As a refresher, Linda Almaguer's short-term secondment from the Longshore Division's Policy Branch to its Fiscal Branch created a temporary vacancy in the assistant chief position. On September 19, 2018, at a meeting at the national Longshore Division office in Washington, D.C., Policy Branch Chief Kristina Hall announced that Maria Mayrand would "informally" fill that vacancy. Def.'s Ex. 15, Hall Dep. at 38:10–11; see also DSUMF ¶ 71. DOL has not presented the Court with clear, contemporaneous documentation of Hall's decision-making, but Hall would later attest that she promoted Mayrand for a few reasons: Mayrand had already volunteered to take on additional responsibilities that would have fallen within the purview of this position; she was closely involved in a major ongoing project to develop a new claims management system; and she had experience working in the Division's district offices— experience that was especially valuable in implementing the new claims system. DSUMF ¶ 65; see also Def.'s Ex. 9, Douglas Fitzgerald Affidavit ("Fitzgerald Aff.") at 6; Def.'s Ex. 10, Fitzgerald Dep. at 22:7–20. Hall also considered that Cofield was scheduled to be on vacation from September 19 to 28, although his trip was ultimately postponed until October. Pl.'s Ex. C, Hall Dep. at 30:13–18; Def.'s Ex. 34, Cofield Dep. at 118:10–20.

At the September meeting, Cofield claims to have been surprised about Mayrand's new role. He later testified that he did not know the position was available, Pl.'s Ex. A, Cofield Dep. at 81:7–10, and states that he was "never offered the opportunity to volunteer, or even made aware of the need for someone to volunteer to take on" Almaguer's duties, PSDMF ¶ 7. Cofield also averred that he, too, had been involved in the development of the claims management system since its inception, though he could not remember specifically what he had contributed to the system's development in 2018 and was not aware that Mayrand had continued to develop the requirements and training for the system through the time of her temporary appointment. Def.'s

Ex. 3, Cofield Dep. at 107:24–110:10.  Cofield concedes that Mayrand had more experience in

the district offices than him.  DSUMF ¶ 68.

Mayrand served in the acting role on a volunteer basis for roughly two months and

continued to receive her GS-13 salary.  Id. ¶ 75.  By October, Almaguer began receiving

increased compensation for her detail in the Fiscal Branch, so in November, Hall was able to

formally promote Mayrand to Acting Assistant Policy Branch Chief and compensate her at the

GS-14 level.  Id. ¶¶ 75–77.  Once promoted, Mayrand could only serve in the higher-graded

position on a non-competitive basis for a maximum of 120 days.  Id. ¶ 77; see also Def.'s Ex. 36,

Email from Jacqueline Perry to Kristina Hall ("Perry-Hall Email").  Hall and Fitzgerald testified

that they planned to rotate Cofield into the acting position if Almaguer was still on her detail

after Mayrand's 120 days were up.  DSUMF ¶ 78.  Cofield maintains that, until he initiated the

EEO complaint process, he did not know that Mayrand was being compensated at a GS-14 level

or that he might have been rotated into the acting position after Mayrand.  Def.'s Ex. 3, Cofield

Dep. at 93:18–97:17.

Cofield was never rotated into the acting position during the 2018–2019 vacancy.

Almaguer completed her formal 120-day stint as Acting Fiscal Branch Chief in February 2019

and returned to the Policy Branch.  See, e.g., Def.'s Ex. 36, Perry-Hall Email (explaining that

Almaguer would "have to return to her official position of record on [February] 17th" because

"competitive service employees may be non-competitively promoted to a higher graded position

for a period not to exceed 120 calendar days").  In May, Almaguer again left the Policy Branch

and was re-hired as Fiscal Branch Chief position on a more permanent basis.  See Def.'s Ex. 37,

Fitzgerald Email to Longshore Division.  After Almaguer's second departure, the Assistant

Policy Branch Chief position sat vacant for nearly two years.  See Pl.'s Ex. A, Cofield Dep. at 103:21–106:23; see also Def.'s Ex. 9, Fitzgerald Aff. at 6.

Cofield disputes that Almaguer ever returned to the Policy Branch, even between February and May 2019, but submits no other evidence to substantiate this assertion.  Pl.'s Ex. A, Cofield Dep. at 103:15–17.  It is uncontested that Mayrand returned to her position as a GS-13 claims examiner in February 2019 and remained there until her retirement.  DSUMF ¶ 82; see also Pl.'s Ex. A, Cofield Dep. at 102:22–103:14, 106:1–14.

### 2. Third-Prong McDonnell Douglas Analysis

Once again, the Court begins by considering whether Cofield was "substantially more qualified" than Mayrand to assume the acting role at this juncture.  Stoe, 960 F.3d at 642 (quoting Hamilton, 666 F.3d at 1352).  This analysis is less straightforward than the last because there was no formal job posting[7] or hiring procedure for the acting position and neither party has submitted documentary evidence of Mayrand's qualifications (e.g., a resume).  Cf. Oviedo v. Wash. Metro. Area Transit Auth., 948 F.3d 386, 396 (D.C. Cir. 2020) (explaining that, without adequate evidence of successful candidate's qualifications, "no reasonable factfinder could find that [plaintiff] was 'significantly better qualified' than [the selectee]" (citation omitted)).

The parties are nevertheless in accord on some core facts.  Cofield and Mayrand were the only two claims examiners in the Policy Branch at the time of Almaguer's secondment to the Fiscal Branch.  DSUMF ¶ 62.  Mayrand had already assumed certain of Almaguer's

---

[7] DOL's Statement of Undisputed Material Facts references a formal description for a "Workers Compensation Specialist Position."  DSUMF ¶ 64; see also Def.'s Ex. 26, Workers' Compensation Specialist Job Description.  Without further development or confirmation from the parties, the Court is not able to discern whether this position is the same as the Assistant Policy Branch Chief position.  In any case, there was no formal job posting for the *acting* position that came available upon Almaguer's temporary departure.

responsibilities, notwithstanding how or why she got them.  She was also working closely on OWCP's new claims management system, see, e.g., Def.'s Ex. 15, Hall Dep. at 30:6–18, 40:15–41:8, though Cofield was apparently not aware that she was helping develop requirements and training for the new system around the time of her appointment to the acting position, see Def.'s Ex. 3, Cofield Dep. at 110:5–10.  For his part, Cofield insists that he "worked on the case management system from its inception" until 2018, but when asked what specific system-related tasks he performed in 2018, he could not recall any.  Id. at 108:2–110:4.  Finally, Cofield concedes that Mayrand had more district office experience than him, see Def.'s Ex. 28, Cofield Dep. at 66:13–20, which Hall perceived as important experience in the development of the new case management system, see, e.g., Def.'s Ex. 25, Agency's Second Set of Resps. to Interrogatories at 3; Def.'s Ex. 14, Hall Decl. ¶ 6.

On this record, the Court cannot conclude that Cofield was markedly better qualified than Mayrand for the Acting Assistant Policy Branch Chief position.  True, Cofield had been with the agency longer than Mayrand and had rotated into the acting position a few years earlier.  See, e.g., Def.'s Ex. 3, Cofield Dep. at 124:9–14.  But even making every reasonable inference in Cofield's favor, under the circumstances at play in 2018, Mayrand was just as strong a candidate as Cofield, if not stronger.

Cofield's only serious rejoinder is that experience with the claims management system was not a requirement for the Assistant Policy Branch Chief position.  Opp. to MSJ at 12.  In support of this proposition, Cofield cites only to his own testimony that "the position of assistant branch chief is not the position of [a claims system] creator," but instead "an administrative position" that entails "managing the daily activities of the branch."  Pl.'s Ex. A, Cofield Dep. at 110:11–111:9.  It may very well be true that, in Cofield's words, working on the claims system

"is one aspect of a larger administrative" project shouldered by the assistant chief.  Id. at 111:8–9.  But Cofield does not establish that Mayrand's experience with the claims system was *un*important; to the contrary, the project was apparently "the top priority not only for the agency but clearly for [Fitzgerald's] office since [it was] the first one[] to . . . deploy [the system] once it was developed."  Def.'s Ex. 10, Fitzgerald Dep. at 20:16–22.  Nor is there any concrete evidence that Cofield was markedly superior at the other administrative aspects of the assistant chief position.  Cofield's "own personal opinion" that he was more qualified than Mayrand "is inadequate by itself to create an issue for the jury."[8]  Walker, 798 F.3d at 1094.

Looking beyond Cofield and Mayrand's comparative qualifications, the Court assesses whether there is other circumstantial evidence to suggest that DOL's explanation for elevating Mayrand was pretext for prohibited discrimination.  Cofield identifies the following purported flaws in DOL's explanation.

*First*, Cofield asserts that he did not affirmatively volunteer for Almaguer's duties because he did not know they were available.  See, e.g., Pl.'s Ex. A, Cofield Dep. at 11:5–7 ("I can't ask for . . . or volunteer for something I don't know about.").  It is not clear from the record precisely when or how Mayrand volunteered to assume some of Almaguer's responsibilities.  Hall's testimony and declarations suggest that Mayrand was assisting Almaguer with her duties well before September 2018, without Hall having asked her to do so.  See Def.'s Ex. 15, Hall

---

[8] It is not even consistently clear that Cofield *himself* believes he was far better suited than Mayrand for the acting position.  At his deposition, Cofield testified that he believed he was substantially more qualified than Mayrand "[i]n terms of the administrative aspects" of the position, Def.'s Ex. 3, Cofield Dep. 122:18–19, but a few moments later stated emphatically that she was "[a]bsolutely" qualified for the position, id. at 12:1–6.  In a response to an interrogatory, Cofield represented that he did "not believe that he was 'more qualified' than Maria Mayrand," but instead was "at the least, *just as qualified*."  Def.'s Ex. 41, Complainant's Responses to Agency's Interrogatories and Requests for Production of Documents at 3 (emphasis in original).

Dep. at 29:17–30:12; Def.'s Ex. 14, Hall Decl. ¶ 6.  Cofield, the only other claims examiner on the team, averred that he "didn't know that any of the tasks [that Mayrand assumed] existed," Pl.'s Ex. A, Cofield Dep. at 114:4–5; was completely "blindsided" by the announcement that Mayrand would assume the acting role, see id. at 80:6; and was unaware that Mayrand's temporary position would be paid or rotational, see Def.'s Ex. 3, Cofield Dep. at 96:17–20.  At the same time, Cofield did not know whether Mayrand had been delegated additional tasks before the informal announcement in September or whether she had instead volunteered for them without being asked.  Id. at 115:4–13.

Making every reasonable inference in Cofield's favor, the record suggests a possible lack of transparency in the Policy Branch that would be understandably exasperating to any team member.  But the record cannot be read to suggest that Cofield was left out of the loop or sidelined because of his race, color, or sex.  Even if the Court were to somehow assume that Hall "preselected" Mayrand, for example by feeding her opportunities that would later qualify her for the acting position, preselection is not unlawful unless there is "evidence from which a reasonable jury could conclude that the purported preselection was animated by discrimination[.]"  Jeffries v. Barr, 965 F.3d 843, 863 (D.C. Cir. 2020).  There is no such evidence here.

Second, Cofield contends that his scheduled September leave cannot have been a real reason for Hall's decision because he told her that he canceled his vacation before she made her announcement to elevate Mayrand to the acting position.  See Opp. to MSJ at 13–14.  This argument is unavailing.  At his deposition, Cofield initially testified that he canceled his leave "long before" September, in "July or August," and Hall was "well-aware" of that fact.  Pl.'s Ex. A, Cofield Dep. at 86:17–19, 23.  But according to contemporaneous email correspondence

between Cofield and Hall, Cofield's trip was still on as late as August 24, 2018, and he told her that his next two weeks would be comprised of "family time and seeing kids off to college." Def.'s Ex. 35, Email from Cofield to Hall.  Confronted with this email chain at his deposition, Cofield conceded that he must have informed Hall at some point between August 24 and September 19 that his trip was canceled, but he could not say whether he told her over email, by phone, or in person just before the September 19 meeting.  See Def.'s Ex. 34, Cofield Dep. at 119:21–25 ("I'm sure there's an e-mail that I would have sent her or called her on the phone to tell her that I was going to be—that the trip was canceled.  I'm sure there are more e-mails that they just don't have here."); id. at 120:1–17; id. at 121:13–122:4 ("[E]ven if [Hall] says that she didn't get an e-mail or phone call, she physically saw me" on the "Monday" or "Tuesday" before the September 19 meeting).

Even making every inference that the record can support in Cofield's favor, he cannot have told Hall "long before" September that his trip was canceled.  At the earliest, he would have apprised her of the cancellation at the very end of August, just a few weeks before she finalized her personnel decision; at the latest, he may have told her a day or two before the decision was announced.  Cofield's testimony is simply too vague to create a meaningful dispute as to the sincerity of Hall's explanation.  And even if Cofield had been more specific, he fails to explain why Hall's knowledge of the cancellation a few weeks before the September meeting would give rise to the inference that she was in fact motivated by unlawful bias.

*Third*, Cofield insists that Hall's explanation for choosing Mayrand is pretext for invidious discrimination because Almaguer "never actually returned to her position as the Assistant Policy Branch Chief, and instead remained with the Fiscal Branch Chief until she was named the Branch Chief in May 2019" and because, even if Almaguer *did* return from February

to May, DOL "offers no explanation for why Cofield could not be rotated in the position in the 18 [subsequent] months that the position was vacant."  Opp. to MSJ at 19.  Like the others, this argument misses the mark.

For one, there is no genuine dispute that Almaguer returned to the Assistant Policy Branch Chief position between February and May 2019.  Contemporaneous emails show that Almaguer had to return to her "official position of record" on February 17 because she had reached the end of the 120-day rotation in her temporary detail.  Def.'s Ex. 36, Perry-Hall Email. And it is undisputed that Mayrand's 120-day rotation as acting assistant chief ended prematurely in February, at which point she returned to her position as a GS-13 claims examiner.  DSUMF ¶ 82.  Even if Almaguer continued to handle some Fiscal Branch business during these few months, Cofield's testimony is too conclusory and controverted by the rest of the record to suggest that the acting position was available during this period.

For another, to the extent Cofield proposes he might have been allowed to rotate into the position after Almaguer departed in May, the Court agrees with DOL that this is effectively a new and discrete non-selection claim.  See MSJ Reply at 17–22.  Even assuming that this claim was properly exhausted and not otherwise forfeited, it is without foundation.  Cofield does not contest that agency leadership elected not to backfill the assistant branch chief role for many months after Almaguer's departure in May 2019.  See Def.'s Ex. 39, Complainant's Response to ROI at 3 ("In late 2019, I learned from Ms. Hall that the Director of OWCP . . . refused to allow the position of Assistant Policy Branch Chief [to be] backfilled permanently.").  Whether or not there was assistant branch chief work to be done during this period,[9] DOL was not obligated to

---

[9] Compare Def.'s Ex. 25, Agency's Second Set of Responses to Complainant's Discovery Requests at 6 (explaining that Almaguer continued to perform Assistant Policy Branch Chief duties while at the Fiscal Branch, even after May 2019), with Def.'s Ex. 9, Fitzgerald Aff. at 6

fill the position and in fact chose not to.  This Court "does not sit as a 'super-personnel department' that reexamines an employer's business decisions," Wheeler, 812 F.3d at 1114 (quoting Barbour v. Browner, 181 F.3d 1342, 1346 (D.C. Cir. 1999)), nor will it "second-guess an employer's personnel decision absent demonstrably discriminatory motive," id. (quoting Fischbach, 86 F.3d at 1183).  Cofield cannot establish that he was passed over for an opportunity that did not exist, let alone that his non-promotion under these circumstances evinces the agency's discriminatory intent.

To sum up: Cofield has not established that he was markedly more qualified than Mayrand to assume the Acting Assistant Policy Branch Chief position from September 2019 to February 2019, and he also has not identified sufficient evidence from which a reasonable jury could infer that the reasons for his non-selection were pretext for invidious discrimination. Cofield's second non-selection claim therefore cannot survive summary judgment.

C. Cofield's Non-Selection as Deputy Fiscal Branch Chief

1. *Relevant Facts*

Finally, Cofield challenges his non-selection as Deputy Fiscal Branch Chief in 2021. This position was a newly-created one, and the job advertisement identified various qualifications that a successful candidate would possess, including "comprehensive knowledge of the [Longshore and Harbor Workers' Compensation Act ("LHWCA")], and related statutes, DOL and OWCP directives and guidelines, and State and Federal workers' compensation laws, regulations, policies, and procedures to serve as a technical expert on matters pertaining to the administration of the Special Fund and the LHWCA and its extensions."  DSUMF ¶ 86.  A

_____

(explaining that, as of August 2019, the Policy Branch was only comprised of Hall, Cofield, and Mayrand, and "there [was] really no one whose work there [was] to coordinate that [couldn't] be managed by Ms. Hall, directly").

successful candidate was also to have independent research and analysis skills regarding insurance coverage under the LHWCA.  Id.

Longshore Division Deputy Director Stephanie Brown and recently-appointed Fiscal Branch Chief Joel Romero interviewed three candidates for the position: Cofield, an unnamed African-American female, and Steven Aronson, a white male who was ultimately selected.  Id. ¶¶ 87, 94; Def.'s Resp. to PSDMF ¶ 16.  All three candidates were GS-13 claims examiners, and Cofield and Aronson worked in the Policy Branch.  DSUMF ¶ 94.  The candidates were asked the same questions during their interviews and then had to complete a thirty-minute assessment where they were tasked with computing an overpayment on a hypothetical claim; the assessment was "designed to test attention to detail and knowledge of the fiscal concept of a cost-of-living adjustment."  Id. ¶¶ 95, 105–06.

Brown was impressed by Aronson:  She described his interview as "excellent," and remarked on his specific responses to questions, his ability to explain how he would apply the skills he had developed in the Policy Branch to his work in the Fiscal Branch, and his knowledge of salient provisions of the LHWCA.  Id. ¶¶ 102–04.  Aronson was also the only candidate to recognize the cost-of-living issue in the written assignment and correctly calculate the overpayment.  Id. ¶ 107.  Brown and Romero thought Cofield performed well, but they were not as impressed with him:  They remarked that Cofield gave general responses to interview questions and did not explain how he would bring his Policy Branch experience to bear in the Fiscal Branch.  Id. ¶¶ 96–100.  Cofield was not able to describe key LHWCA provisions, nor did he identify the cost-of-living issue in his written assignment or correctly complete the overpayment calculation.  Id. ¶¶ 101, 108.

Cofield accepts most of these core facts, although he maintains that the overpayment question "was not straightforward," and "did not provide enough information to answer it correctly or accurately."  PSDMF ¶¶ 11–12.  Rather, Cofield raises a perceived irregularity that occurred *prior* to the hiring process for this position.  For much of 2021, there was a vacancy in the Assistant Policy Branch Chief position, and it was decided that the three claims examiners at the time—Cofield, Aronson, and Mayrand—would rotate through the position.  Def.'s Ex. 21, Jamie Margherio Declaration ("Margherio Decl.") ¶ 11.  Brown, who at the time had just joined the Longshore Division as Deputy Director, apparently received an email from Hall, the outgoing Policy Branch Chief, saying that Cofield should get the chance to go first in the rotation, as he had not received the opportunity to rotate in during Almaguer's absence in 2018 and 2019.  Def.'s Ex. 18, Stephanie Brown Deposition ("Brown Dep.") at 37:18–38:6.  But Jamie Margherio, who replaced Hall as Policy Branch Chief, decided instead to draw names from a hat, which Cofield insists is an unusual method for determining the rotation for a temporary promotion.  PSDMF ¶ 13.  Cofield submits that this purported irregularity casts doubt on the fairness of Aronson's later selection as Deputy Fiscal Branch Chief, even though Margherio was not involved in that selection process.

> ## 2. *Third-Prong <u>McDonnell Douglas</u> Analysis*

One last time, the Court begins by assessing whether Cofield was "substantially more qualified" for the position than Aronson.  <u>Stoe</u>, 960 F.3d at 642 (quoting <u>Hamilton</u>, 666 F.3d at 1352).  Although Cofield testified that he had more experience than Aronson, <u>see</u> Pl.'s Ex. A, Cofield Dep. at 193:21–195:25, the fact remains that Cofield and Aronson were both GS-13 claims examiners from the Policy Branch, <u>see</u> DSUMF ¶ 94.  Brown thought Aronson performed extremely well in his interview; demonstrated familiarity with key provisions in the statute the

Longshore Division is charged with implementing; and articulated how he would translate his experience in the Policy Branch as a member of the Fiscal Branch team.  Id. ¶¶ 102–04. Aronson was also the only candidate to correctly calculate the overpayment in the written portion of the assessment.  Id. ¶ 107.  Brown and Romero thought Cofield performed well in the interview, but expressed concern about his overly-general answers; apparent lack of familiarity with the same key statutory provisions; and relatively less persuasive articulation of how his Policy Branch experience could apply in the Fiscal Branch.  Id. ¶¶ 96–100.  Even if Cofield felt the overpayment calculation question was "poorly-written," Pl.'s Ex. A, Cofield Dep. at 185:12, he does not contest that he answered the question incorrectly, id. at 185:24, and did not identify the cost-of-living adjustment issue in the assessment, id. at 188:5.  Cofield's own deposition testimony confirms that carrying out these kinds of calculations correctly is an important qualification for the Deputy Fiscal Branch Chief position.  Id. at 189:1–6.  The Court cannot, on this record, conclude that there was such a substantial "qualifications gap" between Aronson and Cofield as to be "inherently indicative of discrimination."  Stoe, 960 F.3d (quoting Hamilton, 666 F.3d at 1352).

The follow-on question is, once more, whether Cofield has furnished sufficient evidence of other flaws or irregularities in the selection process that could lead a reasonable jury to conclude that DOL's proffered explanation was pretext for discrimination based on a protected characteristic.  Hamilton, 666 F.3d at 1352.

Setting aside Cofield's qualms with the overpayment question, which do not evince discrimination against him individually as the question was administered to all interview candidates, Cofield points to a *different* selection process as an indication of foul play.  As described above, in 2021, there was a temporary vacancy in the Assistant Policy Branch Chief

position, and it was determined that the three policy examiners at the time would rotate through the position for as long as it was available.  DSUMF ¶¶ 14–20.  Margherio pulled names from a hat to determine the rotation order; she drew Aronson's name and recommended to Brown that he go first.  Id. ¶ 18.  Brown agreed, despite the outgoing suggestion from Hall that Cofield rotate first.  Id. ¶ 20.  Cofield eventually rotated into the position after Aronson, from September 2021 to December 2021.  Id. ¶ 14.

Cofield contends that Margherio and Brown's decision not to follow Hall's suggestion and instead use the hat-draw method for the 2021 rotation "is the picture of pretext."  Opp. to MSJ at 17.  But the picture is not as Cofield sees it, for a few reasons.  *First*, if the hat-draw incident is pretext for any decision, it would be the decision to designate Aronson, rather than Cofield, as the first Acting Assistant Policy Branch Chief in 2021, and Cofield has not squarely challenged that choice in this suit.

*Second*, Margherio had no hand in the hiring process that Cofield *does* challenge—*i.e.*, the selection of Deputy Fiscal Branch Chief.  Nodding towards a "cat's paw" theory of causation, Cofield strains to argue that "Brown was influenced by Margherio's recommendation in favor of Aronson once, and a reasonable jury could infer that such influence from Margherio also affected Brown's selection of Aronson for the Deputy Fiscal Branch Chief position."  Id. But Cofield furnishes no concrete evidence to suggest that Brown's later decision was somehow infected by her approval of Margherio's personnel recommendation on a different team, months earlier.  In fact, Cofield testified at a deposition that he did not have any evidence that Brown had preselected Aronson for the Deputy Fiscal Branch Chief position.[10]  Def.'s Ex. 3, Cofield Dep. at

---

[10] One point is perhaps worth addressing.  The record suggests that, even after his rotation as Acting Assistant Policy Branch Chief ended and Cofield assumed the role, Aronson continued to attend weekly meetings between Policy Branch leadership and the Longshore

229:13–15.  Cofield's arguments about Brown's motives are simply too speculative to raise a reasonable inference of discrimination based on a protected characteristic.  See Opp. to MSJ at 20 ("[W]hile the [2021] rotation itself is not part of Cofield's claims here, the decision by Brown to ignore Hall in favor of Margherio is clear evidence that some reason existed for the refusal to begin the rotation with him in 2021.  Whatever that reason is or was, a reasonable jury could conclude that Brown maintained that same reason when she later selected Aronson for the Deputy Fiscal Branch chief position in 2022.").

Finally, Cofield asserts that Margherio's hat-draw method, which Brown green-lit, was unusual, PSDMF ¶ 13, but the portions of the record he cites do not quite support that proposition.  At best, the record conveys that Brown did not know how rotations through a DOL detail were typically assigned, see, e.g., Pl.'s Ex. D, Brown Dep. at 38:15–43:9.  Without additional context or evidence, the Court is not persuaded that the use of this random selection method was fundamentally unfair or biased—especially where, as here, Cofield eventually got the opportunity to rotate into the Acting Assistant Policy Branch Chief position once Aronson's stint ended.  DSUMF ¶ 14.

---

Division Deputy Director.  Pl.'s Ex. A, Cofield Dep. at 218:7–219:18.  It is not clear why Aronson attended these meetings after his detail was over, or how long he attended them: Cofield surmises it may have been because of a "special project" Aronson was working on with leadership, id. at 218:23–219:11, whereas Margherio's declaration states that Aronson only overlapped with Cofield for a "short period of time" in order to "ensure" a "smooth transition" between the two, Def.'s Ex. 21, Margherio Decl. ¶ 18.

     Although there is some factual ambiguity here, it is not material enough to influence the Court's analysis.  Both Aronson and Cofield served in the acting assistant role before the hiring process for the Deputy Fiscal Branch Chief role got underway, and therefore both had the opportunity to interact with Brown during weekly meetings.  Cofield never explains why Aronson's continued attendance at the weekly meetings casts doubt on the legitimacy of their later competition for the Deputy Fiscal Branch Chief position.

In sum, Cofield has not identified any legally significant flaws in the hiring process for the Deputy Fiscal Branch Chief position, and he points to no other evidence to suggest that Brown's proffered reason for hiring Aronson instead of Cofield—*i.e.*, that Aronson was the better-qualified candidate—was pretext for discrimination based on Cofield's race, color, or sex. The Court therefore grants summary judgment to DOL on Cofield's third non-selection claim.

**D.    Conclusion**

It is undeniable—and, frankly, undenied—that Cofield has been passed over for various job opportunities and promotions at DOL since he joined the agency in the mid-2000s.  While Cofield's lack of upward mobility has no doubt been frustrating, a reasonable jury could not, on this record, conclude that DOL's legitimate, non-discriminatory explanations for Cofield's non-selection as Lead Analyst, Acting Assistant Policy Branch Chief, and Deputy Fiscal Branch Chief were offered to mask prohibited discrimination.  The Court will therefore **GRANT** DOL's motion for summary judgment in its entirety and dismiss the case.  A separate order accompanies this Memorandum Opinion.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  September 26, 2025